SWYGERT, Circuit Judge.
 

 In this proceeding we consider eleven
 
 [1]
 
 consolidated appeals arising out of cases decided under the Truth in Lending Act (“TILA”), 15 U.S.C. §§ 1601
 
 et seq.
 
 Ten different substantive issues are presented, in varying combinations, in these cases.
 
 [2]
 
 The creditors prevailed in each case, and the debtors are the appellants. In the interest of brevity, we will not discuss the facts of the individual cases except to the extent necessary. Rather, we will discuss each of the substantive issues raised, indicating in the margin the cases affected by our resolution of the issue being discussed.
 
 [3]
 

 I.
 

 Two of the cases
 
 [4]
 
 raise the issue whether debtors may respond to a creditor’s suit by filing a counterclaim alleging TILA violations, even though the alleged violations occurred more than one year prior to the filing of the counterclaim, so as to be time-barred under 15 U.S.C. § 1640(e). The appellants recognize that this issue has been determined adversely to their position in
 
 Basham v. Finance America Corp.,
 
 583 F.2d 918 (7th Cir. 1978),
 
 cert. denied, DeJaynes v.
 
 
 *410
 

 Gen. Finance Corp. of Ill.,
 
 439 U.S. 1128, 99 S.Ct. 1046, 59 L.Ed.2d 89 (1979), but they urge that we reexamine our holding on that issue. The primary argument presented is simply a rehash of the argument in the
 
 Basham
 
 case, and we reject it for the reasons stated in the
 
 Basham
 
 opinion.
 

 The only argument on this issue which needs to be addressed separately is the appellants’ reference to the pending “Truth in Lending Simplification Act,” introduced in the 95th Congress as S. 2802 (this bill passed the Senate on May 10, 1978). The bill has been reintroduced in the 96th Congress as S. 108. Section 15(a)(7) of the bill would, according to the appellants, have the effect of amending 15 U.S.C. § 1640 to allow a TILA counterclaim even after the one year period has expired. Without the slightest shred of support in the history of the bill, the appellants claim that this amendment, rather than creating new rights, simply codifies their position as a recognized legal principle.
 
 [5]
 
 We reject this interpretation of the pending bill, and conclude that the district court properly dismissed these counterclaims as time-barred under 15 U.S.C. § 1640(e).
 

 II
 

 The second issue, presented in one case,
 
 [6]
 
 is whether the district court improperly failed to give effect to the terms of a Wage Earner’s Plan under Chapter XIII of the Bankruptcy Act, 11 U.S.C. §§ 1001
 
 et seq.
 
 In this case the creditor filed a reclamation complaint. The debtors, as an affirmative defense, asserted that a Wage Earner’s Plan had been set up under the terms of which the creditor was to receive $1,000 of the debt owed as a secured creditor, with the balance of the debt to be treated as unsecured. It was further alleged that the creditor’s secured interest had been valued by the bankruptcy court at $1,000 under Bankruptcy Rule 13-307, and that the $1,000 portion of the debt which was treated as secured under the plan was in fact paid. Under the debtors’ interpretation, the balance of the debt was unsecured, so that when the debtors subsequently converted their Chapter XIII proceeding to a straight bankruptcy proceeding, the creditor was left with nothing but an unsecured balance, and that this balance was discharged by the subsequent discharge in the straight bankruptcy proceeding. The bankruptcy court denied this defense, without explanation, in an order entered January 30, 1978. The district court affirmed the bankruptcy court, making the following statement:
 

 The appeal upon this issue rests upon the gratuitous assumption by the debtors that the bankruptcy court had theretofore determined the value of Avco’s security interest to be the sum of $1,000. No such determination by that court appears in the record before the court. * s(t * Jf! jk jfc
 

 Avco did accept the Chapter XIII plan, which proposed that it would receive $1,000 on account of its security interest and the payment of the balance of its account in the course of the Chapter XIII administration of the bankrupts’ estates. That plan was abandoned by the debtors when they amended the proceeding to a straight bankruptcy. We cannot say that the bankruptcy court erred in allowing reclamation.
 

 We agree with the district court on both grounds stated. The record is indeed inadequate to determine whether or not the bankruptcy court ever valued the secured interest at $1,000. Even assuming that it had, however, the more fundamental objec
 
 *411
 
 tion stated by the district court remains: the plan was abandoned by the debtors when they converted to a straight bankruptcy proceeding. The debtors attempt to take advantage of the provisions of their plan, without having completed their own payments under the plan. The Bankruptcy Act does not allow such a one-sided use of the terms of a Wage Earner’s Plan. The debtors in effect argue that the security interest was discharged when they paid the $1,000 secured portion of the debt under the plan. However, under Chapter XIII, the discharge of debts occurs only “[u]pon compliance by the debtor with the provisions of the plan and upon completion of all payments to be made thereunder . . . .” 11 U.S.C. § 1060. Consequently, when a debtor fails to complete payments under a Wage Earner’s Plan, the entire original claim of the creditor is revived. 10 Collier on Bankruptcy ¶ 29.07, p. 342 (14th ed. 1978). The Plan having been abandoned by the debtors prior to discharge, the original claim was revived, less payments actually received, and the terms of the abandoned plan were not controlling so as to convert part of the secured debt into an unsecured debt. Accordingly, no error has been shown in allowing reclamation, and we affirm the district court on this issue.
 
 [7]
 

 III
 

 The next issue,- presented in six cases,
 
 [8]
 
 is whether a creditor’s failure to disclose the actual proceeds of a loan on the loan statement constitutes a violation of 15 U.S.C. § 1639(a)(1).
 
 [9]
 
 The debtors have used the metaphorical term “net cash in fist” in identifying this issue. Two of our recent opinions discuss this issue and we begin with a discussion of the ramifications of those opinions.
 

 In
 
 Basham v. Finance America Corp., supra,
 
 we discussed the inconsistency between the requirements of the statute, 15 U.S.C. § 1639(a), and the requirements of Regulation Z § 226.8(d)(1).
 
 [10]
 
 We noted that the regulation only requires the disclosures listed in sections 1639(a)(2) and (a)(3) of the statute, implicitly allowing the actual proceeds of the loan, required under section 1639(a)(1) of the statute, to remain undisclosed. 583 F.2d at 922. We went on to assume without deciding that creditors must comply with the statute even where it differs from Regulation Z. 583 F.2d at 923. Finally, we applied 15 U.S.C. § 1640(f), which precludes liability for any act done or omitted in good faith in conformity with any regulation of the Federal Reserve Board.
 
 Id.
 
 We held that since the creditors had followed the requirements of Reg
 
 *412
 
 ulation Z, no civil liability could be imposed for failure to make the disclosure required by section 1639(a)(1). In a footnote the following comment was added:
 

 We do not reach the issue of whether continued adherence by the creditors to their present form of disclosure after at least one circuit has ruled that it is illegal vitiates their “good faith.”
 

 Id.,
 
 n. 7. This footnote is crucial to the debtors’ argument here because of the Fifth Circuit’s opinions in
 
 Pollock v. General Finance Corp.,
 
 535 F.2d 295 (5th Cir. 1976),
 
 aff’d on rehearing,
 
 552 F.2d 1142 (5th.Cir.),
 
 cert. denied,
 
 434 U.S. 891, 98 S.Ct. 265, 54 L.Ed.2d 176 (1977).
 

 In
 
 Pollock
 
 the Fifth Circuit tended to agree with our view that Regulation Z did not require the disclosure of the actual proceeds of the loan, but held that such disclosure was nevertheless required under the statute itself, and that the regulation must be read in conjunction with the statute. 535 F.2d at 298. In neither of its opinions did the Fifth Circuit have occasion to apply the “good faith conformity” defense which we applied in
 
 Basham.
 
 The debtors in the present appeals argue that creditors are not entitled to the application of the good faith conformity defense for any loan transaction occurring after the Fifth Circuit decision in
 
 Pollock,
 
 at least in the absence of an affirmative showing of good faith.
 

 Our recent opinion in
 
 Warren v. Credithrift of America, Inc.,
 
 599 F.2d 829 (7th Cir. 1979), sheds some additional light on this question. In that case we reaffirmed our holding in
 
 Basham,
 
 and again applied the good faith conformity defense under section 1640(f) so as to preclude liability. 599 F.2d at 831-32. In
 
 Warren
 
 the debtor argued, as do the debtors here, that the good faith conformity defense has no application after the Fifth Circuit’s decision in
 
 Pollock.
 
 Our opinion in
 
 Warren
 
 does not explicitly discuss this point, but simply applies the defense. We take note of the fact, however, that the loan transaction in
 
 Warren
 
 took place
 
 after
 
 the Fifth Circuit’s initial opinion in
 
 Pollock,
 
 but
 
 before
 
 its opinion on rehearing. For this reason we read the
 
 Warren
 
 case as holding, albeit implicitly, that the good faith .conformity defense continues to apply with full force at least until the Fifth Circuit reaffirmed its position on rehearing in
 
 Pollock
 
 on May 27, 1977. This implicit holding is sufficient to dispose of all but two of the loans involved in these six cases, in that only two of the loan transactions occurred
 
 after
 
 the issuance of the Fifth Circuit’s opinion on rehearing.
 
 [11]
 

 As to the remaining two loans, the debtors in effect argue that the
 
 Pollock
 
 opinions should have the instantaneous effect of vitiating the good faith conformity of the creditors to the requirements of Regulation Z, so that the creditors are not entitled to prevail in the absence of an affirmative showing of good faith. We are unwilling to hold that
 
 Pollock
 
 has such an effect. In our view the
 
 Pollock
 
 litigation was not terminated until the Supreme Court denied the petition for a writ of certiorari on October 11,1977. As to loans made before a reasonable period of time had expired after that date, we will not require proof of the subjective good faith of the creditor in following Regulation Z rather than TILA itself. To do otherwise would require creditors to immediately change their loan forms throughout the Nation as soon as any court of appeals finds a violation of TILA notwithstanding the conformity of the forms to the requirements of Regulation Z. We do not believe that Congress intended to force creditors to make instantaneous reactions of this sort.
 
 [12]
 

 
 *413
 
 For the reasons stated, on the authority of our opinions in
 
 Basham
 
 and
 
 Warren,
 
 we affirm the district court’s holding that no liability is imposed for failing to disclose the actual proceeds of the loans involved.
 
 [13]
 

 IV
 

 One of the eases
 
 [14]
 
 presents the issue whether a cause of action under TILA survives in favor of the administrator of a deceased plaintiff. The district court held that the cause of action does not survive. In reaching this conclusion the district court treated the survival question as one of state law. Although the district court recognized the generally remedial purpose of TILA, certain language used in
 
 Mourning v. Family Publications Service, Inc.,
 
 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973), was relied on for the proposition that Regulation Z imposes a penalty.
 
 [15]
 
 The district court concluded that the TILA action is one for a statutory civil penalty, which would not survive under Illinois law in the absence of a specific statutory survival provision.
 

 We reject both the conclusion reached and the analysis used by the district court on this issue. First, we believe that the survival question must properly be determined as a matter of federal, not state, law. It is true, of course, that neither TILA itself nor any other federal statute makes provision for the survival or non-survival of this cause of action. We find, however, no basis for turning to state law in resolving this question. Generally speaking, the question of survival of a federal statutory cause of action is one of federal common law, in the absence of a specific federal statutory directive.
 
 Bowles v. Farmers National Bank,
 
 147 F.2d 425 (6th Cir. 1945);
 
 Heikkila v. Barber,
 
 308 F.2d 558 (9th Cir. 1962). For this reason state survival rules have no application.
 

 Survival of federal civil rights actions under 42 U.S.C. § 1983 has been an area of frequent litigation in the federal courts. However, pronouncements in that area are not authoritative with respect to other federal causes of action, because of the peculiar statutory scheme involved in civil rights actions. 42 U.S.C. § 1988
 
 [16]
 
 specifically refers federal courts to state law in filling in the interstices in federal civil rights actions, unless the state law would be inconsistent with federal law. This special statute thus makes survival of federal civil rights actions a matter of state law, at least in the first instance. This has been made clear recently in
 
 Robertson v. Wegmann,
 
 436 U.S.
 
 *414
 
 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978). However, TILA contains no provision similar to 42 U.S.C. § 1988.
 
 [17]
 

 We are not aware of any cases which have directly considered the question whether a TILA action survives the death of the debtor plaintiff. However, two cases,
 
 Murphy v. Household Finance Corp.,
 
 560 F.2d 206 (6th Cir. 1977), and
 
 Porter v. Household Finance Corp.,
 
 385 F.Supp. 336 (S.D.Ohio 1974), have given indirect consideration to this question. In
 
 Murphy
 
 and
 
 Porter
 
 the question presented was whether such an action passed to a trustee in bankruptcy. In deciding this question, both courts found it necessary to analyze whether a TILA action would survive the death of the debtor plaintiff. The
 
 Murphy
 
 and
 
 Porter
 
 courts used thoughtful and well-reasoned analysis in concluding that a TILA action would survive.
 

 The general rule is that actions for penalties do not survive the death of the plaintiff.
 
 Schreiber v. Sharpless,
 
 110 U.S. 76, 28 L.Ed. 65 (1884). There is no question that TILA creates a cause of action for a civil penalty. Congress has so labeled the action,
 
 [18]
 
 and the Supreme Court has also used this descriptive term.
 
 [19]
 
 But this does not end the analysis. It still must be determined whether the TILA action is penal for the purpose of determining survival. The problem, simply put, is that the term “penal” is used in different contexts to mean different things.
 
 [20]
 

 There are three factors which should be considered in determining whether the TILA action is penal for survival purposes: (1) whether the purpose of the action is to redress individual wrongs or wrongs to the public; (2) whether recovery runs to the individual or to the public; (3) whether the authorized recovery is wholly disproportionate to the harm suffered.
 
 Murphy, supra,
 
 560 F.2d at 209. The application of each of these factors leads to the conclusion that the action is not penal for survival purposes.
 

 The purpose of the TILA action, as reviewed by the Supreme Court in Mourning
 
 v. Family Publications Service, Inc., supra,
 
 411 U.S. at 363-65, 93 S.Ct. 1652, is to remedy abuses resulting from consumer ignorance of the nature of credit arrangements by requiring disclosures in the hope of enabling consumers to shop for credit by comparing uniform terms.
 
 See also
 
 15 U.S.C. § 1601. Without doubt, the statutory scheme has the effect of redressing a perceived social ill, but the entire focus of the legislation is on the options open to the individual consumer. Instead of mandating terms and conditions of credit, Congress chose primarily to mandate only disclosure, leaving the consumer to choose among the available terms and conditions. In this sense, we conclude that the primary purpose of the action is to redress individual wrongs. The recovery under 15 U.S.C. § 1640, of course, runs in favor of the individual.
 

 The fact that multiple damages are allowable under TILA might give rise to the conclusion that the damages are wholly disproportionate to the harm. However, the Supreme Court recognized the modest
 
 *415
 
 measure of damages available under TILA in
 
 Mourning v. Family Publications Service, Inc., supra,
 
 411 U.S. at 376, 93 S.Ct. 1652, see n. 15,
 
 supra.
 
 The damages under the statute serve to liquidate uncertain actual damages and to encourage victims to bring suit to redress violations, but the measure of damages is not so severe as to render it penal.
 
 Porter, supra,
 
 385 F.Supp. at 342.
 

 On the basis of this analysis, we conclude that the TILA action is primarily not penal, but rather remedial, so that it survives. Our conclusion is bolstered by the fact that courts have tended to emphasize the remedial character of the statute.
 
 [21]
 
 We also note that other statutory causes of action which allow cumulative damages are held to create civil remedies rather than penalties.
 
 [22]
 

 In summary, we conclude as a matter of federal common law that a TILA action survives, and we therefore reverse the district court on this issue.
 

 V
 

 The parties have grouped together four different asserted violations, which appear in three of the cases.
 
 [23]
 
 As did the parties, we find it convenient to discuss these problems together, each of which relates to use of mandatory terminology or to clarity of the disclosures made. In No. 78-1263, two violations are asserted. First, it is complained that the disclosure form uses the term “AMOUNT OF NOTE INCL. CHGS. (TOTAL PMTS.)” instead of the term “total of payments” required by Regulation Z, 12 C.F.R. § 226.8(b)(3). The second asserted violation is the non-disclosure of the finance charge, in that the amount, while disclosed, is so obscured behind printed words and lines in the form as to be illegible. In No. 78-2027, the asserted violation is in improper disclosure of security interests taken, in that the word “YES,” which should appear in the box marked “REAL ESTATE MORTGAGE” to denote the taking of a security interest in real estate, appears partially within and partially without the box.
 
 [24]
 
 In No. 78-2145, the asserted violation is in using the additional word “(ESTIMATED)” in conjunction with the required disclosure of “finance charge” under Regulation Z, 12 C.F.R. § 226.8(d)(3) and “total of payments” under 12 C.F.R. § 226.8(b)(3).
 

 A.
 
 Failure to use required terminology
 

 The general statutory requirement of disclosure is contained in 15 U.S.C. § 1631, which provides:
 

 Disclosure requirements — Clear and conspicuous disclosure to person extended consumer credit
 

 (a) Each creditor shall disclose clearly and conspicuously, in accordance with the regulations of the Board, to each person to whom consumer credit is extended, the information required under this part or part D of this subchapter.
 

 Pursuant to its authority, the Federal Reserve Board has promulgated Regulation Z, 12 C.F.R. § 226.6(a) which provides in relevant part:
 

 Disclosures; general rule. The disclosures required to be given by this part shall be made clearly, conspicuously, in meaningful sequence, in accordance with
 
 *416
 
 the further requirements of this section, and at the time and in the terminology prescribed in applicable sections.
 

 It has been widely observed that one of the goals of the statute and Regulation Z is to bring about the standardization of terminology used in connection with credit transactions.
 
 E. g., Pennino v. Morris Kirschman & Co.,
 
 526 F.2d 367, 370 (5th Cir. 1976);
 
 Powers v. Sims & Levin Realtors,
 
 396 F.Supp. 12, 20 (E.D.Va.1975),
 
 aff’d,
 
 542 F.2d 1216 (4th Cir. 1976);
 
 Good Housekeeping Shop v. Hines,
 
 146 Ga.App. 713, 247 S.E.2d 142, 144 (1978). The rationale behind standardized terminology is that it facilitates consumer identification of the items listed, thereby encouraging comparison of the various credit terms which may be available.
 
 Powers v. Sims & Levin Realtors, supra; Sambolin v. Klein Sales Co.,
 
 422 F.Supp. 625, 628 (S.D.N.Y.1976). The private civil damage action, which we have indicated serves primarily to redress the wrong to the individual, also serves the function of creating a system of “private attorneys general” to participate in enforcing the broader social goal of standardization of terminology used.
 
 McGowan v. King, Inc.,
 
 569 F.2d 845, 848 (5th Cir. 1978);
 
 Ratner v. Chemical Bank New York Trust Co.,
 
 329 F.Supp. 270, 280 (S.D.N.Y.1971).
 

 In view of the goal of standardized terminology to facilitate comparison shopping, many courts have held that the failure to use the required terminology results in a violation of TILA.
 
 [25]
 
 It is not sufficient to attempt to comply with the spirit of TILA in order to avoid liability. Rather, strict compliance with the required disclosures and terminology is required.
 
 Kristiansen v. John Mullins & Sons, Inc.,
 
 59 F.R.D. 99 (E.D.N.Y.1973). Many violations of TILA involve technical violations without egregious conduct of any kind on the part of the creditor. However, Congress did not intend that creditors should escape liability for merely technical violations.
 
 Pennino v. Morris Kirschman & Co.,
 
 526 F.2d 367 (5th Cir. 1976). Thus, while it may be true, in some sense, as the creditors have argued, that the terminological violations here are inconsequential, the fact remains that they are violations. Any misgivings which creditors may have about the technical nature of the requirements should be addressed to Congress or to the Federal Reserve Board, not to the courts.
 
 Gennuso v. Commercial Bank & Trust Co.,
 
 566 F.2d 437, 443 (3d Cir. 1977).
 

 In an early and thoughtful opinion, Judge Frankel of the Southern District of New York rejected the argument that creditors should not be subjected to liability for so-called “reasonable” mistakes, noting that the statute’s remedial aim is to protect consumers. Countenancing “reasonable” violations would be grossly subversive of the purpose of the statute.
 
 Ratner
 
 v.
 
 Chemical Bank New York Trust Co.,
 
 329 F.Supp. 270, 282 (S.D.N.Y.1971). Inexplicably the Fifth Circuit seems to have straddled the fence on the question whether liability is imposed for technical violations. In
 
 Dixon v. D. H. Holmes Co.,
 
 566 F.2d 571 (5th Cir. 1978), the court affirmed a holding that TILA requires truth in lending but not the use of shibboleths or other sacred terms, so that failure to use required language was excused. Similarly, in
 
 Bussey v. Georgia Bank Americard,
 
 516 F.2d 452 (5th Cir. 1975), a number of deviations from required terminology were excused.
 
 [26]
 
 However, in
 
 Pennino v. Morris Kirschman & Co.,
 
 526 F.2d 367 (5th Cir. 1976), the court refused to sanction the use of improper language which the district court had found to be functionally equivalent to the required ter
 
 *417
 
 minology. With respect, we believe that the approach used by the Fifth Circuit in the
 
 Pennino
 
 case is sounder than the more
 
 ad hoc
 
 analysis utilized by the same court in
 
 Dixon
 
 and
 
 Bussey.
 
 We will therefore require strict adherence to the required terminology under the statute and regulations, and we will not countenance deviations from those requirements, however minor they may be in some abstract sense.
 

 Applying this analysis to the two terminological violations in these cases, the first presents no difficulty. We find a violation in the use of the term “AMOUNT OF NOTE INCL. CHGS. (TOTAL PMTS.)” instead of the required term “total of payments.” While under the prophylactic approach which we have adopted it will never be necessary to prove that the debtor was misled by the improper terminology in order to recover,
 
 see McGowan v. King, Inc.,
 
 569 F.2d 845, 848 (5th Cir. 1978), we do note that an unsophisticated debtor might well have difficulty in comparing two forms, one using the required terminology and the other using the terminology found here.
 

 Determining whether it was proper for the creditor to use the additional word “(ESTIMATED)” in conjunction with the disclosure of the “finance charge” and the “total of payments” is more complex in light of the creditor’s argument that estimated figures are permitted under Regulation Z, 12 C.F.R. § 226.6(f) if the figure is marked as estimated, if insufficient information is available although reasonable efforts have been made to ascertain the information, and if this is not done for the purpose of evasion.
 

 The parties are in agreement as to the reason the estimated figures were used here. The loan in question was a simple interest loan, so that the precise amount of interest charged under the loan depends on the timing of the payments made. The interest charges will vary slightly depending on whether payments are made on the due dates or early or late. Thus, for example, the precise amount due as the last installment cannot be determined until the payment is actually made. This uncertainty is common to all simple interest loans. Given the requirements of disclosure under TILA, the only reasonable alternative available to the creditor is to disclose the various figures based on the assumption that all payments will be made on the due dates. The question then presented is whether these assumed figures should simply be disclosed, using the required terminology to describe them, or whether they should be disclosed as estimated figures, as was done here, in an attempt to reflect the uncertainty inherent in simple interest loans.
 

 We conclude that the method of disclosure used here was improper, and that the figures should simply have been disclosed as “finance charge” and “total of payments” based on the assumption that the payments would be made when due. In the first place, we note that the Federal Reserve Board has taken this position.
 
 [27]
 
 The construction given the statute and regulation by the Board is certainly entitled to some deference.
 
 Philbeck v. Timmers Chevrolet, Inc.,
 
 499 F.2d 971 (5th Cir. 1974). More fundamentally, we believe that the creditor here argues for an overly broad use of estimated figures under the statute and regulation. It is apparent from the restrictive requirements imposed on the use of estimated figures under Regulation Z
 
 [28]
 
 
 *418
 
 that estimated figures are to be used only when absolutely necessary. This is entirely consistent with the standardization and comparison shopping goals of the Act discussed above. If, in the process of comparing terms, a consumer finds some simple interest loan disclosures given only in estimated figures, confusion is bound to result. Yet, under the interpretation offered by the creditor,
 
 all
 
 simple interest loans could be disclosed in this manner. This would undermine the purposes of the statute. Since the figures, when based on the assumption of payments being made when due, are readily available from charts and tables, the provisions of 12 C.F.R. § 226.6(f) are not applicable, and we find it improper to disclose these figures as “estimated.”
 

 B.
 
 Blurred or obscured disclosure
 

 Nothing can be more central to the entire scheme of TILA than the notion that disclosures made must be legible.
 
 [29]
 
 The required disclosures become meaningless if the consumer is unable to decipher them. In this case, the disclosure of the $168.41
 
 [30]
 
 finance charge is obscured behind lines and words printed on the form itself so as to be, in our opinion, unreadable. We therefore must respectfully disagree with the finding of the district court that the figure is clearly legible.
 
 [31]
 
 No doubt the legibility problem arose in this case because the copies of the form were not properly aligned before insertion into the typewriter. We note that this is the sort of clerical error for which the defense in 15 U.S.C. § 1640(c) may be applicable.
 
 [32]
 
 However, the creditor did not here attempt to demonstrate the existence and maintenance of procedures reasonably adapted to avoid and prevent errors of the sort which occurred. The creditor has the burden of proof as to these matters, and in the absence of an affirmative showing, the clerical error defense is not available.
 
 Mirabal v. General Motors Acceptance Corp.,
 
 537 F.2d 871, 877-79 (7th Cir. 1976);
 
 Turner v. Firestone Tire & Rubber Co.,
 
 537 F.2d 1296 (5th Cir. 1976). Since no showing has been made, a violation of the disclosure requirement has been established.
 

 C.
 
 Improper marking of security interest boxes
 

 The form used in this case is designed to disclose the various security interests taken by having either a “YES” or “NO” typed in each of the three boxes indicating the security interests which may be taken. The first box contains a “YES.” The second box also contains a “YES.” The third “YES,” however, appears partially within the second and partially within the third box. This gives rise to the debtor’s argument that the taking of a mortgage as a security interest (indicated by the third box) has not properly been disclosed.
 

 
 *419
 
 If the third box had been left entirely blank, we would have no hesitancy in holding that this results in a violation of the disclosure requirements.
 
 Clausen v. Beneficial Finance Co.,
 
 423 F.Supp. 985 (N.D.Cal.1976). However, in this case the third “yes” does appear partially within the appropriate box, and it is, as noted by the district court, obvious that the third “yes” applies to the third box. Also, there is no problem of legibility involved here. None of the purposes served by TILA would be advanced by finding a violation under the circumstances presented, and we refuse to do so.
 

 By way of summary, we find violations of TILA in both cases of use of improper terminology. We also find a violation in the illegible disclosure of the finance charge. We find no violation resulting from the relationship of each word “yes” to its appropriate box.
 

 VI
 

 The next issue, raised in five of the cases,
 
 [33]
 
 is whether the creditors have violated TILA by improperly disclosing the security interest taken in after-acquired property. The claim of the debtors is that the disclosures made do not correctly reflect the limitations on security interests in after-acquired property which are imposed by the Uniform Commercial Code. A creditor desiring to hold a security interest must make the following disclosure under 15 U.S.C. § 1639(a)(8):
 

 A description of any security interest held or to be retained or acquired by the creditor in connection with the extension of credit, and a clear identification of the property to which the security interest relates.
 

 The provision of Regulation Z relating to disclosure of security interests, section 226.-8(b)(5), provides in pertinent part as follows:
 

 (b)
 
 Disclosures in sale and nonsale credit.
 
 In any transaction subject to this section, the following items, as applicable, shall be disclosed:
 

 (5) A description or identification of the type of any security interest held or to be retained or acquired by the creditor in connection with the exten- • sion of credit, and a clear identification of the property to which the security interest relates . . . . If after-acquired property will be subject to the security interest, or if other or future indebtedness is or may be secured by any such property, this fact shall be clearly set forth in conjunction with the description or identification of the type of security interest held, retained or acquired.
 

 The permissible extent of security interests in after-acquired property is governed by section 9-204(2) of the Illinois Uniform Commercial Code (UCC), Ill.Rev.Stat. ch. 26, §§ 1-101
 
 et seq.:
 

 No security interest attaches under an after-acquired property clause to consumer goods other than accessions (Section 9-314) when given as additional security unless the debtor acquires rights in them within 10 days after the secured party gives value.
 

 As was true in
 
 Tinsman v. Moline Beneficial Finance Co.,
 
 531 F.2d 815 (7th Cir. 1976), and
 
 Basham v. Finance America Corp.,
 
 583 F.2d 918 (7th Cir. 1978),
 
 cert. denied,
 
 439 U.S. 1128, 99 S.Ct. 1046, 59 L.Ed.2d 89 (1979), the dispute on this issue centers on the claim that the creditors have failed to properly disclose the ten-day limitation imposed by the UCC.
 

 In
 
 Tinsman
 
 the debtor disclosed its security interest in terms which contained no reference to the ten-day limitation. We held this to be a violation of TILA, in that the description of the type of security interest held and the identification of the secured property were misleading, and the fact of after-acquired property interests was not clearly set forth with accuracy. 531 F.2d at 819. Similarly, in
 
 Basham,
 
 three of the four cases involved violations because of the failure to contain any refer
 
 *420
 
 ence to the time limitation. In the fourth
 
 Basham
 
 case, however, the disclosure clearly and accurately disclosed the extent of the security interest under the UCC, and we held that there was no TILA violation.
 
 [34]
 

 Against this decisional background, it is apparent that one of the present cases, No. 78-1443, is directly governed by
 
 Tinsman
 
 and
 
 Basham.
 
 Since absolutely no reference is made to the ten-day limitation, a violation of TILA has been established. The creditor attempts to justify the failure to disclose by a cryptic reference to an unpublished opinion of Judge Morgan in
 
 Schisler
 
 v.
 
 Avco Financial Services,
 
 P-Civ-76-71 (S.D.Ill.1976). The gist of the argument seems to be that the creditor properly relied on a series of unofficial staff opinion letters of the Federal Reserve Board.
 
 [35]
 
 However, we rejected any purported reliance on these same letters in
 
 Basham, supra,
 
 583 F.2d at 918, and we see no reason for departing from the analysis used there.
 

 The disclosures in Nos. 78-1236, 78-1238, and 78-2145 are more ambiguous. In the disclosure statement for each loan, it is disclosed that security interests are taken in:
 

 Consumer Goods including but not limited to household goods, furniture, appliances and personal property of all kinds and descriptions; all accessions and additions now or hereafter installed in or affixed thereto; proceeds and replacements thereof; and consumer goods hereafter acquired within 10 days after Secured Party gives value.
 

 While reference is made to the ten-day limitation under the UCC, we conclude that this disclosure has been so poorly drafted that there is nevertheless a violation of TILA. The semicolons used to set off each of the four clauses serve to divide each into a separate claim of a security interest. The problem with the drafting of the disclosure is that under the normal principles of English usage, the ten-day limitation applies
 
 only
 
 to the last of the four clauses. We may assume that no problem is presented by the second clause, claiming a security interest in “all accessions and additions now or hereafter installed in or affixed thereto.” Accessions are explicitly not subject to the ten-day limitation under UCC section 9-204(2). While it can plausibly be argued that “additions” are broader than “accessions” so that a ten-day limitation should properly be disclosed in connection with additions, at least one court has held that the phrase “additions and accessions” should be read to cover only accessions so that there is no need to disclose a ten-day limitation.
 
 Anderson v. Southern Discount Co.,
 
 582 F.2d 883 (4th Cir. 1978). The next clause, however, “proceeds and replacements thereof,” is unacceptable. While “proceeds” are automatically covered by an existing security agreement under UCC section 9-306(3)(a), we have already held that “replacements” are not synonymous with “proceeds,” in that replacement goods may be financed from sources other than proceeds.
 
 Tinsman, supra,
 
 531 F.2d at 818. Yet the disclosure made here leads the consumer to conclude that all replacement goods are covered by the security arrangement, whether or not purchased within the ten-day period. This conclusion is incorrect as a matter of Illinois law, and we hold that the disclosure violates TILA in that the identification of the secured property is misleading, and the after-acquired property interest is not clearly set forth with accuracy.
 

 In the last case, No. 78-1609, the disclosure is made in the following terms:
 

 This loan is secured by the following: . A security interest of even date which covers future indebtedness, replacement of collateral, personal property
 
 *421
 
 of like kind acquired within ten (10) days after this loan is made and the following personal property . . . .
 
 [36]
 

 While this disclosure is not as well-drafted as the provision approved by this court in
 
 Basham,
 
 it does accurately describe the nature and extent of the security interest under Illinois law. The phrase “personal property
 
 of like kind
 
 acquired within ten (10) days” (emphasis added), makes' it clear that the ten-day limitation is broad enough to cover the replacements of collateral mentioned in the previous phrase.
 
 See Basham, supra,
 
 583 F.2d at 926, n. 11. This serves to distinguish this case from the previous three cases, in which the language suggested that replacement goods are not subject to the ten-day limitation. Thus, we conclude that no violation has been established in this ease.
 

 We emphasize again, as we did in
 
 Basham, supra,
 
 583 F.2d at 925, that the disclosures required are not onerous, and uniformity of disclosure is made possible by the fact that forty-nine states have adopted the UCC. However, TILA does not allow creditors to disclose their security interests in after-acquired property in broad terms that distort the actual extent of these interests under state law.
 

 VII
 

 In one case,
 
 [37]
 
 the debtors argue that the district court improperly denied class action certification. The record reflects the fact that the district court dismissed the class action counts of the complaint on September 16,1977 (apparently by oral order made in open court). The case proceeded on the individual claims, resulting in judgment being entered for the creditor, on February 3, 1978. The debtors filed their notice of appeal on February 7, 1978.
 

 At the outset we are presented with a jurisdictional objection by the creditor. The creditor argues that the class certification issue is not properly before us since the only order on appeal is the judgment on the merits entered February 3, 1978. Apparently the creditor’s position is that the debtors were obligated to file a notice of appeal from the September 16, 1977 dismissal of the class action counts in order to preserve the class certification issue for appeal.
 

 The jurisdictional objection of the creditor is plainly without merit. First, we note that the dismissal of the class action counts was not certified for appeal under Fed.R.Civ.P. 54(b) or under 28 U.S.C. § 1292(b). Second, it is now firmly established that a denial of class certification is not appealable as a final order, as a collateral order, or under the so-called “death knell” doctrine.
 
 Coopers & Lybrand v. Livesay,
 
 437 U.S. 463, 96 S.Ct. 2454, 57 L.Ed.2d 351 (1978);
 
 Anschul v. Sitmar Cruises, Inc.,
 
 544 F.2d 1364 (7th Cir.),
 
 cert. denied,
 
 429 U.S. 907, 97 S.Ct. 272, 50 L.Ed.2d 189 (1976). As a result, a plaintiff wishing to appeal the denial of a class certification must await the entry of an appeal-able order. In this case the debtors raise the class action issue on appeal from the final judgment order. As such, we conclude that the issue is properly before us on appeal.
 

 On the merits of the class certification issue, we note that we have found it necessary to reverse the district court on another issue in appeal No. 78-1238.
 
 See
 
 Part VI,
 
 supra.
 
 The reason for the district court’s rejection of the class action counts is not clear from the record. Since the case will be back before the district court in any event, that court should consider on remand the class action allegations of the complaint.
 
 See Basham v. Finance America Corp.,
 
 583 F.2d 918, 929 (7th Cir. 1978),
 
 cert. denied,
 
 439 U.S. 1128, 99 S.Ct. 1046, 59 L.Ed.2d 89 (1979).
 

 
 *422
 
 VIII
 

 Ten of the cases
 
 [38]
 
 involve one or more instances in which the district court refused to exercise pendent jurisdiction over claims arising under state law. This issue is discussed under three separate headings in the brief of the debtors, for reasons that are not entirely apparent. Since the fundamental issue is the same, we shall discuss the cases under all three headings together, except when necessary to clarify the application of the principles to the cases involved.
 

 The starting point in any discussion of pendent jurisdiction is
 
 United Mine Workers v. Gibbs,
 
 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). That case establishes that pendent jurisdiction in the sense of power to adjudicate state claims exists whenever the relationship between the state claim and the federal claim is such that the claims constitute one constitutional “case.”
 
 Gibbs, supra,
 
 383 U.S. at 725, 86 S.Ct. 1130. However, the actual exercise of pendent jurisdiction is discretionary with the district court. The justification for exercise of pendent jurisdiction is in terms of judicial economy, convenience, and fairness, so that when these factors are not present, federal courts should hesitate to adjudicate the state claims.
 
 Gibbs, supra,
 
 383 U.S. at 726, 86 S.Ct. 1130. As a result, when the federal claims are disposed of at the outset of a case (certainly if they are dismissed before trial), it is proper for the district court to refuse to consider the pendent state law claims.
 
 Gibbs, supra,
 
 383 U.S. at 726, 86 S.Ct. 1130;
 
 Whitefield v. Iilinois Board of Law Examiners,
 
 504 F.2d 474 (7th Cir. 1974);
 
 Nemkov v. O’Hara Chicago Corp.,
 
 592 F.2d 351 (7th Cir. 1979). On the other hand, if the state law and federal law claims are tried together, it would normally be desirable to retain the state law claims.
 
 Forest Laboratories, Inc. v. Pillsbury Co.,
 
 452 F.2d 621 (7th Cir. 1971).
 

 None of the cases before us proceeded to a trial on the merits before the federal claims were disposed of either on motions to dismiss or motions for summary judgment. In No. 78-2145 there was an evidentiary hearing held on a limited aspect of the case. Applying well-established principles of pendent jurisdiction to these cases, we find that it was entirely within the discretion of the district court to decline to exercise pendent jurisdiction over the state claims in ea.ch case, since the federal claims were dismissed prior to full trials. However, we have found it necessary to reverse the judgments of the district court in several of these cases (see summary in Part IX,
 
 infra),
 
 and on remand the district court should determine whether, in light of the viability of the federal claims in those cases, it is now appropriate to exercise pendent jurisdiction over the state claims as well.
 

 One of the cases, No. 78-1718, requires special comment. In this appeal, the creditor filed a reclamation complaint in a Chapter XIII proceeding, and the debtors raised their TILA and state law claims in a counterclaim to the reclamation complaint. On December 2, 1977 the bankruptcy court denied the reclamation complaint. On March 2, 1978 the bankruptcy court entered an order dismissing the TILA counterclaim and refusing to exercise pendent jurisdiction over the state law claim. On appeal the district court affirmed the ruling of the bankruptcy court. Although the record does not contain a copy of the order of the bankruptcy court confirming the Chapter XIII arrangement, the record clearly does reflect the fact that such an order was entered, and that the creditor was to receive partial payment of the amount owed it under the terms of the arrangement.
 

 In most respects this case is similar to the other nine cases in which the district court refused to exercise pendent jurisdiction. The debtors do make an additional argument in this case which warrants some attention. The argument is that since the bankruptcy court was providing some relief
 
 *423
 
 to the creditor in the form of partial payment under the Chapter XIII plan, the state law counterclaim should have been examined by the bankruptcy court for the purpose of determining whether the creditor’s claim was “free from any charge forbidden by applicable law” under Bankruptcy Rule 13-301(b).
 
 [39]
 
 Although the debtors are not very explicit on this point, we believe the gist of the argument to be that apart from any affirmative relief for the asserted state law violations, they were entitled to have those violations considered for the purpose of defending against the Chapter XIII claim by demonstrating that the creditor’s claim was based on a charge forbidden by state law. Unfortunately, this argument was not presented to either the bankruptcy court or to the district court. If it had been, perhaps the debtors would have been entitled to some relief. We, however, decline to consider this argument when raised for the first time on appeal.
 
 Stern v. United States Gypsum, Inc.,
 
 547 F.2d 1329 (7th Cir.),
 
 cert. denied,
 
 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977). For this reason, we hold that it was proper in No. 78-1718 to refuse to exercise pendent jurisdiction.
 

 IX
 

 The disposition of cases in this appeal is as follows: Nos. 78-1441, 78-1528, 78-1609, 78-1718, and 78-1796 are affirmed; Nos. 78-1236, 78-1238, 78-1263, 78-1443, 78-2027, and 78-2145 are reversed and remanded for further proceedings consistent with this opinion.
 

 Affirmed In Part; Reversed In Part.
 

 [1]
 

 . In addition, two other appeals were originally consolidated with the present appeals (Nos. 78-1442 and 78-1610). Those appeals were dismissed prior to oral argument and no further reference will be made to them.
 

 [2]
 

 . Points 5, 8 and 10 in the brief of the appellants are discussed together in Part VIII of this opinion,
 
 infra.
 
 Points 11 and 12 in the brief of the appellants simply state broad propositions of law, namely, that all ambiguities in loan documents are to be construed against the lender, and that the TILA must be liberally construed. These “issues” need not be discussed except insofar as they relate to the disposition of particular substantive issues.
 

 [3]
 

 . Regrettably, we find it necessary to remind counsel for the appellants that appellate courts will not ordinarily consider issues which were not passed on in the trial court.
 
 Singleton
 
 v.
 
 Wulff,
 
 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). A number of the issues which counsel claims are presented in various cases simply are not before us on appeal, never having been passed on in the district court.
 
 See Basham v. Finance America Corp.,
 
 583 F.2d 918, 923 n. 8, 927 n. 15 (7th Cir. 1978),
 
 cert. denied, DeJaynes v. Gen. Finance Corp. of Ill.,
 
 439 U.S. 1128, 99 S.Ct. 1046, 59 L.Ed.2d 89 (1979) (similar comments directed to the same appellate counsel).
 

 [4]
 

 . Nos. 78-1528 and 78-1796.
 

 [5]
 

 . Indeed the relevant portion of the Committee report quoted by the appellants tends, if any- • thing, to support the opposite view:
 

 Finally, this section addresses defensive truth in lending claims by consumers in two respects. . . Also, a provision is added permitting actions in recoupment or offset beyond the one year statute of limitations, except where otherwise provided by State law or rules of civil procedure. r.
 

 Report of Senate Committee on Bankingi Housing & Urban Affairs (April 24, 1979),
 
 reprinted in
 
 CCH Consumer Guide Special Report (May 3, 1979).
 

 [6]
 

 . No. 78-1796.
 

 [7]
 

 .
 
 See also
 
 Bankruptcy Rule 122(1), dealing with conversion of cases under Chapters X, XI, XII, and XIII to straight bankruptcy cases:
 

 (1)In all respects other than as provided in the following paragraphs, the case shall be deemed to have been commenced as of the date of the filing of the first petition initiating a case under this title and shall be conducted as far as possible as if no petition commencing a chapter case had been filed.
 

 Treating the now-abandoned plan as still binding on the parties after conversion to bankruptcy would be inconsistent with the terms of Rule 122(1).
 

 [8]
 

 . Nos. 78-1236, 78-1238, 78-1263, 78-1441, 78-1718 and 78-2027.
 

 [9]
 

 . 15 U.S.C. § 1639(a) provides in relevant part:
 

 (a) Any creditor making a consumer loan or otherwise extending consumer credit in a transaction which is neither a consumer credit sale nor under an open end consumer credit plan shall disclose each of the following items, to the extent applicable:
 

 (1) The amount of credit of which the obli-gor will have the actual use, or which is or will be paid to him or for his account or to another person on his behalf.
 

 (2) All charges, individually itemized, which are included in the amount of credit extended but which are not part of the finance charge.
 

 (3) The total amount to be financed (the sum of the amounts referred to in paragraph (1) plus the amounts referred to in paragraph (2)).
 

 [10]
 

 .Regulation Z § 226.8(d)(1), 12 C.F.R. § 226.-8(d)(1) requires the disclosure of:
 

 The amount of credit, . which will be paid to the customer or for his account or to another person on his behalf, including all charges, individually itemized, which are included in the amount of credit extended but which are not part of the finance charge, using the term “amount financed.”
 

 [11]
 

 . One of the loans involved in No. 78-1263 was made after the Fifth Circuit’s opinion on rehearing but before denial of the certiorari petition by the Supreme Court on October 11, 1977. One of the loans involved in No. 78-2027 was made twenty-nine days after the denial of certiorari.
 

 [12]
 

 . Indeed Congress has specifically shown sensitivity to the problems creditors experience in changing the loan forms which they use. When TILA was first enacted the disclosure requirements of the statute were not made effective until more than thirteen months after enactment. Pub.L.No.90-321, § 504(b).
 

 [13]
 

 . What we have said does not undercut the fact that for loans made after a reasonable period has expired after conclusion of the
 
 Pollock
 
 litigation, courts in this circuit will have to determine whether continued adherence to present forms is excused under section 1640(f). We do not reach this question in this proceeding, and, of course, any factual determinations of subjective good faith in future cases will have to be made in the district court, in the first instance.
 

 [14]
 

 . No. 78-2027. The issue is not properly raised in No. 78-1609 because in that case the district court allowed substitution of the administrator as party-plaintiff and ruled in favor of the creditor on the merits. Only the debtor has appealed, so the survival issue is not before us.
 

 [15]
 

 . “Since the civil penalty prescribed is modest and the prohibited conduct clearly set out in the regulation, we need not construe this section as narrowly as a criminal statute providing graver penalties, such as prison terms.” 411 U.S. at 376, 93 S.Ct. at 1664.
 

 [16]
 

 .42 U.S.C. § 1988 provides in relevant part:
 

 The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of this chapter and Title 18, for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.
 

 [17]
 

 .For this reason the citation of civil rights cases is not persuasive for the general proposition that survival of federal causes of action is determined by reference to state law. For example, the only two cases cited for this proposition by the creditors in these appeals are
 
 Holmes v. Silver Cross Hospital,
 
 340 F.Supp. 125 (N.D.Ill.1972), and
 
 Dear v. Rathje,
 
 391 F.Supp. 1 (N.D.Ill.),
 
 aff’d,
 
 532 F.2d 756 (7th Cir. 1975), both of which were civil rights actions.
 

 Similarly all of the cases relied on by the district court in ruling that survival is to be determined by reference to state law were cases decided under the civil rights statute. We have recognized that the reference to state law under 42 U.S.C. § 1988 is not applicable in non-civil rights actions.
 
 Green v. Carlson,
 
 581 F.2d 669 (7th Cir. 1978),
 
 cert. granted,
 
 940 U.S. 442, 99 S.Ct. 2880, 61 L.Ed.2d 309 (1979) (No. 78-1261).
 

 [18]
 

 . Consumer Credit Protection Act, H.R. No. 1040, 1968 U.S.Code Cong. & Admin.News, pp. 1962, 1976, 1987.
 

 [19]
 

 .
 
 See
 
 n. 15,
 
 supra.
 

 [20]
 

 . The Supreme Court discussed this problem at some length in
 
 Huntington v. Attrill,
 
 146 U.S. 657, 666-69, 13 S.Ct. 224, 36 L.Ed. 1123 (1892).
 

 [21]
 

 .
 
 See, e. g., Littlefield v. Walt Flanagan & Co.,
 
 498 F.2d 1133, 1136 (10th Cir. 1974);
 
 Eby v. Reb Realty, Inc.,
 
 495 F.2d 646, 650 (9th Cir. 1974);
 
 N. C. Freed Co. v. Board of Governors of the Federal Reserve System,
 
 473 F.2d 1210, 1214 (2d Cir.),
 
 cert. denied,
 
 414 U.S. 827, 94 S.Ct. 48, 38 L.Ed.2d 61 (1973).
 

 [22]
 

 . For example, antitrust treble damages actions.
 
 Chattanooga Foundry & Pipe Works v. Atlanta,
 
 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906). By way of contrast,
 
 see Bowles v. Farmers National Bank,
 
 147 F.2d 425 (6th Cir. 1945), a case involving treble damages under the Emergency Price Control Act of 1942, which was designed primarily to protect the public during an emergency, and not to redress wrongs to individuals. The action was held penal, so that it did not survive. A more complete list of decisions can be found in
 
 Porter, supra,
 
 385 F.Supp. at 341.
 

 [23]
 

 .Nos. 78-1263, 78-2027, and 78-2145.
 

 [24]
 

 .
 

 [25]
 

 .
 
 E. g., McGowan v. King, Inc.,
 
 569 F.2d 845, 848 (5th Cir. 1978);
 
 Welmaker v. W. T. Grant Co.,
 
 365 F.Supp. 531, 536 (N.D.Ga.1972);
 
 Barber v. Kimbrell’s Inc.,
 
 424 F.Supp. 42, 47 (W.D.N.C.1976),
 
 aff’d,
 
 577 F.2d 216 (4th Cir.), cert.
 
 denied,
 
 439 U.S. 934, 99 S.Ct. 329, 58 L.Ed.2d 330 (1978);
 
 Sambolin
 
 v.
 
 Klein Sales Co.,
 
 422 F.Supp. 625, 628 (S.D.N.Y.1976);
 
 Palmer v. Wilson,
 
 359 F.Supp. 1099 (N.D.Cal.1973),
 
 vacated on other grounds,
 
 502 F.2d 860 (9th Cir. 1974).
 

 [26]
 

 . Two district court opinions which also excuse “de minimis” violations are
 
 Glover v. Doe Valley Development Corp.,
 
 408 F.Supp. 699 (W.D.Ky.1975), and
 
 Mims v. Dixie Finance Corp.,
 
 426 F.Supp. 627 (N.D.Ga.1976).
 

 [27]
 

 . Federal Reserve Board Letter, May 9, 1975, CCH Consumer Credit Guide II 31,224.
 
 Cf.
 
 Federal Reserve Board Letter 1099, August 10, 1976, CCH Consumer Credit Guide li 31,439; Federal Reserve Board Official Staff Interpretation FC-0092, June 24, 1977, CCH Consumer Credit Guide ¶ 31,620.
 
 See also Anderson v. Southern Discount Co.,
 
 582 F.2d 883 (4th Cir. 1978) (no violation in disclosing finance charge computed on assumption that payments will be made on due dates).
 

 [28]
 

 . Regulation Z, 12 C.F.R. § 226.6(f) provides in relevant part:
 

 If at the time disclosures must be made, an amount or other item of information required to be disclosed, or needed to determine a required disclosure, is unknown or not avail-' able to the creditor or lessor and the creditor or lessor has made a reasonable effort to ascertain it, the creditor or lessor may use an estimated amount or an approximation of the
 
 *418
 
 information, provided the estimate or approximation is clearly identified as such, is reasonable, is based on the best information available to the creditor or lessor and is not used for the purpose of circumventing or evading the disclosure requirements of this Part.
 

 [29]
 

 . Regulation Z, 12 C.F.R. § 226.6(a) requires that disclosures be made “clearly.”
 

 [30]
 

 . We note that both parties and the district court have assumed that the amount of the finance charge is $188.41, while the process of subtraction yields the figure $168.41. This simply underscores the fact that the figure is illegible.
 

 [31]
 

 . We are in as good a position as was the district court to determine whether the figure is legible. Therefore, the finding of fact on this question does not carry the same weight as findings involving credibility determinations.
 
 Shumaker v. Groboski Industries, Inc.,
 
 352 F.2d 837 (7th Cir. 1965).
 

 [32]
 

 .15 U.S.C. § 1640(c) provides:
 

 A creditor may not be held liable in any action brought under this section for a violation of this subchapter if the creditor shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.
 

 It has widely been held that this defense applies only to truly clerical errors and not to errors in judgment as to what the statute and regulations require.
 
 E. g., Ratner v. Chemical Bank New York Trust Co.,
 
 329 F.Supp. 270, 280 (S.D.N.Y.1971);
 
 Haynes v. Logan Furniture Mart, Inc.,
 
 503 F.2d 1161, 1166-67 (7th Cir. 1974).
 

 [33]
 

 . Nos. 78-1236, 78-1238, 78-1443, 78-1609, and 78-2145.
 

 [34]
 

 . The language approved in the
 
 Basham
 
 case was as follows:
 

 Debtor further grants to Secured Party a security interest in all goods, personal property and chattels of the same or similar type or kind to that described above now owned or hereafter acquired, excepting only after acquired consumer goods acquired more than 10 days after the date hereof.
 

 [35]
 

 . The specific letters cited in the
 
 Schisler
 
 opinion were Letter 829, CCH Consumer Credit Guide 1! 31,151, Letter 983, CCH Consumer Credit Guide f 31,323, and Letter 1053, CCH Consumer Credit Guide ¶ 31,393.
 

 [36]
 

 . The description of collatéral in the security agreement substantially tracks the language in the disclosure statement:
 

 Plus, whenever acquired: all accessions, attachments, equipment, replacements, parts, original or substituted; proceeds, dividends, return of any premium of any insurance related to this transaction; all other property like above collateral acquired within ten days after this loan is made.
 

 [37]
 

 . No. 78-1238.
 

 [38]
 

 . Nos. 78-1236, 78-1238, 78-1263, 78-1443, and 78-2145. 78-1528, 78-1609, 78-1718, 78-1796, 78-2027,
 

 [39]
 

 . Bankruptcy Rule 13-301(b) reads:
 

 Evidentiary Effect. A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim, but any creditor may be required by the court to establish, by affidavit or in such other manner as the court may require before allowance of the claim, that it is free from any charge forbidden by applicable law.