**Shirley M. PRIDEGON,
Plaintiff-Appellant,**

v.

**GATES CREDIT UNION,
Defendant-Appellee.**

No. 81–1270.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 27, 1981.

Decided July 2, 1982.*

of the duration of the risk, the number of employees exposed, and their proximity to the danger zone.

* This opinion has been circulated pursuant to Circuit Rule 16(e). All active judges have voted not to rehear this case en banc with respect to the treatment of *Smith v. No. 2 Galesburg Crown Finance Corp.,* 615 F.2d 407 (7th Cir. 1980).

Barry M. Barash, Barash, Stoerzbach & Henson, Galesburg, Ill., for plaintiff-appellant.

Douglas D. Mustain, West, Neagle & Williamson, Galesburg, Ill., for defendant-appellee.

Before CUMMINGS, Chief Judge, SPRECHER, Circuit Judge,** and GRANT, Senior District Judge.***

GRANT, Senior District Judge.

In a single count complaint filed on December 29, 1980, appellant-plaintiff Shirley M. Pridegon alleged that a loan transaction between herself and Gates Credit Union ("Gates") violated the Federal Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.*, and Regulation Z promulgated thereto, 12 C.F.R. §§ 226 *et seq.* (1981). Specifically, she alleges in her complaint the following nine violations:

a. Creditor, in its security agreement, claimed an overbroad and unlawful security interest in consumer's after-acquired consumer goods ["... and any and all additions, accessions, attachments, accessories, repairs, replacements, substitutions and proceeds thereof, thereto or therefrom ..."], in violation of U.C.C. § 9–204(2) [Illinois Revised Statutes 1977, ch. 26, § 9–204(2)] and thereby violated 15 U.S.C. § 1639(a)(8), and Regulation Z § 226.8(b)(5).

b. Creditor, in violation of Regulation Z § 226.8(a), failed to make all disclosures required by Regulation Z on a single document, on the same side of the page and above or adjacent to the place for the customer's signature or on one side of a separate statement which identifies the transaction.

c. Creditor, in violation of Regulation Z § 226.6(a) and 15 U.S.C. § 1639(a)(5) failed to clearly disclose to consumer the annual percentage rate.

d. Creditor, disclosed to consumer that the payments on the loan were $156.24 per month, whereas, the payments were made weekly at the rate of $58.20 per week, or $252.18 per month, in violation of 15 U.S.C. § 1639(a)(6) and Regulation Z § 226.-8(b)(3).

e. Creditor, in violation of 15 U.S.C. § 1639(a)(1) and Regulation Z § 226.-8(d)(1), failed to disclose to consumer on a single document the amount of credit of which the obligor will have

** Judge Sprecher participated in oral arguments and voted at conference on this case, but his untimely death occurred during circulation of this opinion and before his final vote.

*** Honorable Robert A. Grant, Senior District Judge of the United States District Court for the Northern District of Indiana, sitting by designation.

the actual use, or which is or will be paid to her or for her account or to another person on her behalf.

f. Creditor, on the reverse of the disclosure statement, and in in [sic] violation of Regulation Z § 226.8(a), prohibited debtor from removing the automobile from Colorado, when the loan was made in Illinois, and creditor knew that consumer resided in Illinois and would operate the car in that state, not Colorado. Creditor's attempt to impose a default in such manner, without disclosing the default to consumer on page one of the disclosure statement, violates 15 U.S.C. § 1639(a)(7) and Regulation Z § 226.8(b)(4).

g. Creditor, in the disclosure statement, failed to disclose that it had any interest in any personal property, whereas, the security agreement discloses a security interest in consumer's account at Gates Credit Union and the 1978 Buick automobile. The inconsistency and creditor's failure to make accurate disclosures violates 15 U.S.C. § 1639(a)(8) and Regulation Z § 226.8(b)(5).

h. If consumer fails to remain in the employ of the Gates Rubber Company, creditor has the right to accelerate the entire balance due on the note. In the disclosure statement, creditor failed to disclose that element of default, thereby violating 15 U.S.C. § 1639(a)(7) and Regulation Z § 226.8(b)(4).

i. Creditor, in the disclosure statement, disclosed that the security agreement "may" cover after-acquired property, whereas, the security agreement in fact covers all after-acquired property, including substitutions and replacements. The disclosure statement failed to accurately disclose the nature and extent of the underlying security agreement, thereby violating 15 U.S.C. § 1639(a)(8) and Regulation Z § 226.8(b)(5).

Gates filed an answer on January 23, 1981, denying all of Pridegon's allegations. It subsequently amended the answer on February 11, 1981, to include a "good faith conformity" defense.

On January 26, 1981, Pridegon filed a motion for summary judgment which simply cited six cases in support without any argument. On February 2, 1981, Gates filed its response to Pridegon's motion in addition to its own motion for summary judgment with a supporting memorandum. On February 12, 1981, the district court, without any accompanying memorandum, denied Pridegon's motion for summary judgment and granted Gates'. Pridegon appeals from this judgment.

*Facts*

Shirley M. Pridegon is a 31 year-old production worker for the Gates Rubber Company in Galesburg, Illinois. Employed there since 1972, she is paid on an hourly basis and receives a check weekly. On November 19, 1980, Pridegon borrowed $4,703.92 from Gates. The loan was secured by her 1978 Buick Regal. The $4,703.92 borrowed represented the total of the refinancing of a prior Gates loan of $3,883.53, interest on this prior loan of $20.39 and a cash payment to Pridegon of $800.00.

Pridegon requested on a November 17, 1980 "Confidential Application for Loan" document she filed with Gates that $90 be deducted from her weekly check to be applied to her two savings [share] accounts and her one loan account. She listed the purpose of the loan as "Christmas and Ref. C.U. [Refinanced Credit Union] Loan." Records of Gates, dated December 31, 1980, show that of the deducted $90, $43.75 went to share account # 429816–0, $10 went to share account # 429816–9 and $36.25 went as principal and interest payment on the loan account.

The "Promissory Note, Security Agreement and Disclosure Statement" (hereinafter "loan agreement") between Pridegon and Gates was on one double-sided document. The Disclosure Statement Section showed:

| | |
|---|---|
| Proceeds | $4,703.92 |
| No additional insurance or official charges | -0- |
| Amount financed | $4,703.92 |

| | |
|---|---|
| Finance charges | |
| Interest $902.61 | |
| FINANCE CHARGE (Total) | $ 902.61 |
| Total of Payments | $5,624.53 |
| ANNUAL PERCENTAGE RATE | 12% |

The Promissory Note section indicated a 12% simple annual interest with 36 monthly installments of $156.24.

The Disclosure Statement also provided that the "Promissory Note is secured by the Security Agreement below" and further provided that the Security Agreement "may cover after-acquired property, except as to consumer goods unless the debtor acquires rights in them within ten (10) days after the Credit Union gives value." The Security Agreement section listed a 1978 Buick Regal and "any and all additions, accessions, attachments, accessories, repairs, replacements, substitutions, and proceeds thereof" as security. The Security Agreement also provided that the Promissory Note and other obligations were "secured by after-acquired Collateral under the Uniform Commercial Code, [and that] after-acquired property in 'consumer goods' is limited to goods acquired within ten days after the secured party gives value." All of the separate sections contained in the loan agreement and the Confidential Application were signed by Shirley M. Pridegon. There is no dispute as to the authenticity of those signatures.

On this appeal, she contends that Gates' claim to after-acquired security was overbroad and unlawful; that Gates failed to make all the disclosures in a single document as required by Regulation Z; that the annual percentage rate was not legibly written on the loan form; that Gates deducted from Pridegon's employment checks payments on the loan in excess of the disclosed monthly amount; that Gates failed in a single document to disclose the amount of credit of which she would have actual use; that the disclosure statement failed to "track" the underlying security agreement; and that the discrepancy whether the security agreement "may" or did in fact cover all after-acquired property violated TILA and Regulation Z. For the sake of completeness, we shall address each argument individually.

### Overbreadth of after-acquired property clause

The Security Agreement in question provides in part that "the Debtor grants to the Secured Party a security interest in the following described property and any and all additions, accessions, attachments, accessories, repairs, replacements, substitutions and proceeds thereof . . ." Pridegon argues that this clause violates § 9–204(2) of the Illinois Uniform Commercial Code (UCC)[1] by claiming after-acquired property without properly disclosing the ten-day consumer goods limitation imposed by the UCC. She claims this omission violates TILA § 1639(a)(8)[2] and Regulation Z § 226.8(b)(5).[3]

1. Section 9 204(2) Illinois Uniform Commercial Code (UCC), Ill.Rev.Stat. ch. 26, §§ 1–101 *et seq.* provides:

> No security interest attaches under an *after-acquired property clause* to consumer goods other than accessions (Section 9–314) when given as additional security unless the debtor acquires rights in them *within 10 days after the secured party gives value.*

(emphasis added).

2. 15 U.S.C. § 1639(a)(8) provides:

> A description of any security interest held or to be retained or acquired by the creditor in connection with the extension of credit,

and a clear identification of the property to which the security interest relates.

3. 12 C.F.R. § 226.8(b)(5) (1981) provides:

> (b) *Disclosures in sale and nonsale credit.* In any transaction subject to this section, the following items, as applicable, shall be disclosed:
>
> \* \* \* \* \* \*
>
> (5) A description or identification of the type of any security interest held or to be retained or acquired by the creditor in connection with the extension of credit, and a clear identification of the property to which the security interest relates or, if such property is not identifiable, an explanation of the

Pridegon is correct in asserting that the above-quoted clause does not include the ten day limitation requirement. However, immediately following it, the Security Agreement goes on to provide that:

The Promissory Note and other Obligations previously set forth shall be secured by after-acquired Collateral Under the Uniform Commercial Code, *after-acquired property in "consumer goods" is limited to goods acquired within ten days after the secured party gives value.*

(emphasis added). While the ten-day limitation is not contained in the sentence which outlines the security interests but in the succeeding paragraph, we nevertheless find that the Security Agreement read in its entirety with the reference to "Obligations previously set forth," properly incorporates the ten-day limitation as to consumer goods. In *Smith v. No. 2 Galesburg Crown Finance Corp.*, 615 F.2d 407, 420 (7th Cir. 1980), this court held that a facially valid ten-day consumer goods limitation, if poorly drafted so as to create confusion or misunderstanding on the part of a borrower, could nevertheless violate TILA. In that instance, however, the disclosure listed security interests separated by semicolons. We found the use of the semicolons served to divide each clause into separate claims of a security interest and that "the ten-day limitation applies *only* to the last of the four clauses." *Id.* (emphasis in original). In this case, the Security Agreement makes indisputably clear that the ten-day consumer goods limitation applies to "[t]he Promissory Note and other Obligations previously set forth." There is no doubt, unlike *Smith*, that the ten-day consumer goods limitation applies to the security interest in Pridegon's Buick Regal and any and all additions, ac-

cessions, etc., by its incorporation by reference and its position immediately following the legal description of the automobile. We find that the description properly and fully described the secured property and properly and fully set forth the after-acquired property interest within the ten day consumer goods proscription of TILA, Regulation Z and the UCC.

### Single Document

Section 226.8(a) of Regulation Z [4] requires that:

All of the disclosures shall be made together on either:

(1) The note or other instrument evidencing the obligation on the same side of the page and above the place for the customer's signature; or

(2) One side of a separate statement which identifies the transaction.

Pridegon argues that the loan agreement fails to satisfy this requirement by not disclosing her actual payment obligations in the loan agreement above her signature. She argues that the Promissory Note calls for the loan to be repaid in 36 monthly installments of $156.24 each while her Confidential Application for Loan calls for weekly payments of $58.20. Multiplying the latter figure by 4.33 to obtain the monthly payment results in a sum of $252.18, or an excess of $95.94 over the disclosed repayment amount.

From an examination of Pridegon's Credit Union statement, however, we find that $36.25 per week was correctly credited to her loan account and not the $58.20 as she contends. The $58.20 was apparently the weekly payment made under her prior

manner in which the creditor retains or may acquire a security interest in such property which the creditor is unable to identify. In any such case where a clear identification of such property cannot properly be made on the disclosure statement due to the length of such identification, the note, other instrument evidencing the obligation, or separate disclosure statement shall contain reference to a separate pledge agreement, or a financing statement, mortgage, deed of trust, or similar document evidencing the security in-

terest, a copy of which shall be furnished to the customer by the creditor as promptly as practicable. If after-acquired property will be subject to the security interest, or if other or future indebtedness is or may be secured by any such property, this fact shall be clearly set forth in conjunction with the description or identification of the type of security interest held, retained or acquired.

4.  12 C.F.R. § 226.8(a) (1981).

loan agreement which was refinanced in this disputed loan. After the new loan agreement was entered into on November 19, 1980, the weekly loan payment was reduced to $36.25. On a monthly basis, this equals $156.24, the amount indicated in the Promissory Note. Thus, there was disclosure in a single document of the correct amount of the required monthly repayment.

▮ Pridegon also points to the terms of the Security Agreement which appear on the reverse side of the loan agreement without her signature below it. The Disclosure Statement, Promissory Note and Security Agreement were all contained on a single, double-sided document with bold notation on the bottom of the front page above Pridegon's signature which stated: "Notice: See Reverse Side For Important Information." The reverse side was captioned "Additional Terms, Conditions And Provisions Of Security Agreement (Continued from other side)," with the additional provisions in lower case print followed with bold notation: "Notice: See other side for important information and signature."

It must be stressed that all of the material information regarding the amount of the loan, the interest rate, the repayment amount and the security interest description was contained on one side of the agreement with Pridegon's signature appearing below each section. The terms and conditions on the reverse side do not go to any essential or important element of the contract, *i.e.*, duration, amount or interest rate. There were bold notations on both sides indicating a continuous document. Such continuation of certain portions of a loan agreement because of a document's length is authorized by a Federal Reserve Staff Interpretation. It states that:

(a) Some creditors incorporate the terms of a contract, a security agreement and evidence of a transaction in a single document. These documents are designed for processing by mechanical and electronic equipment. If all of the required disclosures under § 226.8 should be placed on the face of such a document, the creditor will be unable to utilize con-

ventional accounting and record keeping equipment because of the size of the resulting document. The question arises as to whether required disclosures may be made on the face and the reverse side of such a document.

(b) Where a creditor elects to combine disclosures with the contract, security agreement, and evidence of a transaction in a single document, the disclosures required under § 226.8 shall, in accordance with § 226.6, be made on the face of that document, on its reverse side, or on both sides: *Provided,* That the amount of the finance charge and the annual percentage rate shall appear on the face of the document, and, if the reverse side is used, the printing on both sides of the document shall be equally clear and conspicuous, both sides shall contain the statement, *"Notice:* See other side for important information," *and the place for the customer's signature shall be provided following the full content of the document.* 12 C.F.R. § 226.801 (1981). (emphasis added).

This interpretation was adopted to allow an exception to the § 226.8(a) disclosures in documents designed for mechanical or electronic processing. Gates cites this interpretation in its brief but fails to state whether this loan agreement document was designed for mechanical or electronic processing, but the Federal Reserve has further indicated that "the interpretation is designed to be sufficiently broad to encompass future advances in accounting and record-keeping technology which might necessitate some flexibility in the location requirements of § 226.8(a)." Federal Reserve Board Staff Opinion No. 1016, CCH Cons.Cred.Guide ¶ 31,356 (March 19, 1976). Whether the loan agreement in question was drafted and prepared with this in mind is unclear from the record. However, in light of subsequent Federal Reserve Staff Opinions, we need not rely on the applicability of § 226.-801.

Federal Reserve Board Staff Opinion No. 1154 examines this very issue. It provides in part:

If the combined note/disclosure statement/security agreement to which you refer is not of the type described in the first paragraph of § 226.801, the interpretation would not apply. Rather, the general rule of § 226.8(a)(1) [¶ 3565] is inapplicable, and it provides that, if disclosures are made on the instrument, the disclosures must be made together on the same side of the page and above or adjacent to the place for the customer's signature. The combined instrument may encompass more than one page and the contractual terms may appear anywhere, *but all of the Truth in Lending disclosures must be made on the same side of the page above or adjacent to the place for the customer's signature.*

Federal Reserve Board Staff Opinion No. 1154, CCH Cons.Cred.Guide ¶ 31,536 (February 10, 1977). (emphasis added). *See also* CCH Cons.Cred.Guide ¶ 31,104, ¶ 31,147, ¶ 31,356.

The Supreme Court recently reexamined the weight of such Board opinions and concluded that "judges ought to refrain from substituting their own interstitial lawmaking for that of the Federal Reserve, so long as the latter's lawmaking is not irrational." *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568, 100 S.Ct. 790, 798, 63 L.Ed.2d 22 (1980). *See also Anderson Brothers Ford v. Valencia*, 452 U.S. 205, 219, 101 S.Ct. 2266, 2273, 68 L.Ed.2d 783 (1981). Remembering that the purpose of TILA is to promote the "informed use of credit" by consumers, 15 U.S.C. § 1601, and that Congress intended to require "a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him," *Id.*, it is clear to us that these objectives were readily achieved by the face of this challenged document. Federal Reserve Opinion No. 1154 is reasonable and within the spirit of TILA considering the length of the disputed loan form and the requirement that the finance charge and annual percentage rate appear on the face of the document. Thus, the authorization of the use of the reverse side was rational.

■ While the terms and conditions contained on the reverse side were the "boilerplate" provisions of the loan, referring to debtor warranties, default conditions and creditor remedies, these are contractual terms between the parties, not the credit provisions within the scope of TILA. Pridegon also points to the absurdity of a provision on the back side which prevents her from removing her car out of the State of Colorado. This provision is indeed vague and confusing considering the plain fact that Pridegon and the auto always were located in Illinois. This provision is not, however, being enforced by the creditor nor does the condition conflict with the main purpose of the contract. To reject the entire contract because of the erroneous use of one word, *i.e.*, Colorado, would defeat the purpose and intent of the parties. While it is not the function of the judiciary to rewrite a contract, "[t]he courts are not, because of this, limited to the literal meaning of the words or the express provisions set forth in the instrument." *Williston on Contracts*, § 610B, 3rd Ed. (1961). The loan agreement should be considered in this set of facts and circumstances which demonstrate the intent of the parties to secure an interest upon an automobile in Illinois.

The fact that a contract has been put into express words does not prevent the meaning and legal operation of those words from being affected by their factual environment. Where indispensable to effectuate the intention of the parties, a contract may be implemented beyond its express language; courts have the power to inquire into the real purpose of the agreement; language, though seemingly plain and clear, will not bear a literal interpretation if this leads to an absurd result or thwarts the manifest intention of the parties.

*Id.* at p. 545. (footnotes omitted).

■ We agree with the analysis of Judge Chapman in *Sanders v. Auto Associates, Inc.*, 450 F.Supp. 900, 903–04 (D.S.C.1978), wherein he stated:

It is unclear whether a signature on the reverse side is required if any disclosure

appears there or whether references to the back from the front and then to the front from the back result in the full content appearing on the front. Because of this ambiguity and because the presence or absence of a signature on the reverse side of the document is a technicality which does little to accomplish the purposes of the Truth in Lending Act, this Court liberally construes 12 CFR § 226.8(a) and Interpretation § 226.801 to accomplish justice in this case and finds that the absence of a signature under the disclosures contained on the reverse side of the loan form does not constitute a violation of the Truth in Lending Act.

For these reasons, this court will not reject the entire loan agreement because of the confusing use of one phrase or absence of a signature when the main intention of the parties is manifestly clear.

■ Pridegon also argues that the Disclosure Statement makes no reference to weekly payments. The Promissory Note which she signed called for 36 monthly payments but on her Confidential Application for Loan, Pridegon requested $90 per week be deducted from her earnings to be applied to her savings and loan accounts. This was a voluntary act upon her part as her loan obligation only required a monthly payment. If the debtor chooses to make more frequent payments for her convenience, that goes beyond the loan agreement and need not be disclosed by Gates.

### Unclear Annual Percentage Rate

■ Pridegon contends that the interest rate was not clearly written on the loan agreement. Our reading reveals no such problem. While on Pridegon's copy of the loan agreement the figure of 12% is partially intersected by a line, apparently because of misalignment of the carbons, our reading of the document submitted with the complaint as an exhibit clearly shows 12%. Unlike the disclosure in *Smith v. No. 2 Galesburg Crown Finance Corp.*, 615 F.2d at 418, this disclosure was not obscured by lines and printed words so as to make the figure illegible.

### Excess Monthly Payments

■ This issue was discussed earlier. Pridegon argues that if Gates required weekly deductions from her paycheck, the Promissory Note should have similarly disclosed a weekly payment amount, the total number of payments and the due dates or periods of payment as required by 12 C.F.R. § 226.8(b)(3) (1981). In support, she points to Federal Reserve Board Staff Opinion No. 667, CCH Cons.Cred.Guide ¶ 30,940 (January 30, 1973), which provides:

Staff believes that a credit union *which requires a borrower to use* plan # 2 has effectively changed the terms of the obligation, from the borrower's standpoint, from a monthly payment schedule to the schedule of payroll deductions, for example, bi-weekly. The result is that all disclosures cannot be made on the basis of the monthly transfers from shares to the loan account but, instead, must reflect the required payments which are made under the payroll withholding schedule. The disclosures under § 226.8(b)(3) of the number, amount and due dates or periods of payment would need to reflect the required payment schedule based upon the payroll deductions.

(emphasis added).

It is not contested that Pridegon signed the Confidential Application for Loan which authorized Gates to deduct $90 weekly and apply that amount to her various accounts. Pridegon makes no allegation that she was required to deduct an amount from her weekly pay. To the contrary, Michael Kerr, Gates' loan officer in Colorado, states in an affidavit that "Pridegon voluntarily requested payroll deductions, part of which to be applied to this loan payment and part to be applied to her Vacation Club and part to be applied to her Share Account; ... Pridegon was under no obligation to make or allow such payroll deductions. She can, by any manner she chooses, make the monthly payment of $156.24." The content of Mr. Kerr's affidavit has not been challenged but, rather, his competency to testify re-

garding the account has been. Pridegon has submitted no supporting evidence that weekly payments were required by Gates and, therefore, F.R.B. Opinion No. 667 is not applicable.

It must be pointed out again that from a review of Gates' Statement of Account for Pridegon, $36.25 per week was in fact applied to her loan account. Pridegon apparently is confusing a prior loan payment with her present loan payment.

### Disclosure of "Net Cash in Fist"

■ The loan agreement between Pridegon and Gates does not expressly specify the amount of cash which was being loaned to her in addition to the refinancing of her earlier loan. Specifically, the loan agreement fails to disclose that Pridegon would be receiving $800 in cash from the transaction. She argues that this omission of the actual cash proceeds of the loan constitute a violation of 15 U.S.C. § 1639(a)(1)[5] and Regulation Z § 226.8(d)(1).[6]

There is some question whether the loan agreement fails to satisfy § 1639(a)(1). The "Proceeds" of the loan contained in the Disclosure Statement lists only $4,703.92. It did not break down this amount into the refinancing of the earlier loan of $3,883.53, interest due of $20.39 and the additional cash paid to Pridegon of $800. However, this disclosure does satisfy § 226.8(d)(1), which only requires the disclosures listed in §§ 1639(a)(2) and (3).[7]

The inconsistencies between the requirements of the statute and the requirements of Regulation Z have been discussed at length by this court and are summarized in *Smith v. No. 2 Galesburg Crown Finance Corp.*, 615 F.2d at 411–13. In *Smith*, we adopted as the law in this Circuit the decision of the Court of Appeals for the Fifth Circuit in *Pollock v. General Finance Corp.*, 535 F.2d 295 (5th Cir. 1976), aff'd on rehearing, 552 F.2d 1142 (5th Cir.), cert. denied, 434 U.S. 891, 98 S.Ct. 265, 54 L.Ed.2d 176 (1977), which held that Regulation Z § 226.8(d)(1) failed to conform to the requirements of the statute and that a creditor must "make a labeled disclosure of actual loan proceeds in accordance with § 1639(a)." 552 F.2d at 1144. In *Pollock*, the creditor had indicated the total amount of the loan including a separate disclosure of the amount of credit insurance charges. The court held that the creditor's failure to subtract these charges from the total loan in order to determine the amount financed constituted an inadequate disclosure within the requirements of § 1639(a)(1). 535 F.2d at 299.

In a Fifth Circuit decision decided subsequent to the first hearing in *Pollock* but prior to the rehearing, *McGowan v. Credit Center of North Jackson, Inc.*, 546 F.2d 73 (5th Cir. 1977), the court considered whether "the statute and its implementing regulation require individual disclosure of every separate disbursement which is to be made

---

**5.** 15 U.S.C. § 1639(a) provides:

(a) Any creditor making a consumer loan or otherwise extending consumer credit in a transaction which is neither a consumer credit sale nor under an open end consumer credit plan shall disclose each of the following items, to the extent applicable:

(1) The amount of credit of which the obligor will have the actual use, or which is or will be paid to him or for his account or to another person on his behalf.

**6.** 12 C.F.R. § 226.8(d) (1981) provides:

(d) *Loans and other nonsale credit.* In the case of a loan or extension of credit which is not a credit sale, in addition to the items required to be disclosed under paragraph (b) of this section, the following items, as applicable, shall be disclosed:

(1) The amount of credit, excluding items set forth in paragraph (e) of this section, which will be paid to the customer or for his account or to another person on his behalf, including all charges, individually itemized, which are included in the amount of credit extended but which are not part of the finance charge, using the term "amount financed."

**7.** 15 U.S.C. § 1639(a)(2) and (3) provides:

(2) All charges, individually itemized, which are included in the amount of credit extended but which are not part of the finance charge.

(3) The total amount to be financed (the sum of the amounts referred to in paragraph (1) plus the amounts referred to in paragraph (2)).

from the net amount generated by the loan for the borrower's use or benefit." *Id.* at 76. The creditor in *McGowan* had indicated the base amount to be financed, the finance charges and the total amount financed. The creditor did not break down the base amount into the proceeds used to pay off prior loans and the amount of additional cash given the borrower. The court found that the statute and the regulations do not require individual disclosure of separate disbursements.

The court examined the wording of § 1639 and Regulation Z § 226.8(d)(1) and stated that:

> Examining the regulation alone without consulting the separation of the three requirements in subsection (a) of Section 1639 could produce an erroneous answer. The regulatory requirement for itemization might reasonably be read as applying to both of the disclosures to be made for charges that are not part of the finance charge. As suggested by *Pollock*, however, this interpretation of the regulatory language would be improper. The statute is the foundation for the regulation and its *raison d'etre*, and the two must be read together. When they are, the proper construction becomes clear. The itemization required by paragraph (2) of Section 1639(a) and echoed in the regulation applies only to charges made by the lender for costs incurred in connection with the making of the loan, such as insurance and recording fees, which are not included in the finance charge. *Other component parts of the amount financed, e.g., sums applied to retire outstanding loan balances, need only be disclosed within the total paragraph (1) sum, to be paid out to the borrower or for his use to others, and need not be individually itemized.*

546 F.2d at 76. (emphasis added).

In the case before us, Gates disclosed, similarly to *McGowan*, the amount of credit given Pridegon but did not break down the loan into individual disbursements before disclosing the finance charges and the total amount borrowed. But as the Fifth Circuit

held in a case subsequent to *Pollock* "[t]he statute does not require disclosure of 'the *total* amount of credit' or any other formulation which would unequivocally mandate the use of a single lump sum figure. Nor are we compelled by our understanding of legislative intent to construe the term 'amount' in such a manner." *Barbieri v. Commercial Credit Loans, Inc.,* 596 F.2d 660, 661–2 (5th Cir. 1979). (emphasis in original).

Federal Reserve Board Staff Opinion No. 982, CCH Cons.Cred.Guide ¶ 31,321 (Dec. 24, 1975), interpreting 12 C.F.R. § 226.8(d)(1), provides that in disclosing the amount financed, it is permissible for a creditor to use a general term, such as "loan proceeds" to describe the basic loan to which the additional charges are added.

> *Regulation Z nowhere requires,* either expressly or by implication, *the use of such terms as* "net cash to borrower" *or* "net proceeds to borrower." *Section 226.-8(d)(1) prescribes only the term amount financed to indicate to the customer the amount of credit which will be made available to him; . . . in disclosing the amount financed and the charges included in that amount, it would be* permissible, *of course, to use a term such as* "loan proceeds," *if applicable, in describing the basic loan amount to which the other charges under § 226.8(d)(1) are added.*

(emphasis added). That Staff Opinion concluded that a general term, such as the one used here by Gates, satisfies § 226.8(d)(1).

Another Federal Reserve Board Interpretation, FC–0114, Appendix to 12 C.F.R. at 698, provides:

> It is the staff's opinion that § *129(a) of the Act and § 226.8(d)(1) of the regulation do not require a creditor to itemize component parts of the amount remaining after excluding all charges that are not part of the finance charge from the amount financed.* It should be noted that this interpretation is limited to the question of the need to itemize components of the loan proceeds and expresses no opin-

ion with regard to the separate disclosure of the loan proceeds.

(emphasis added).

Gates asserts two arguments before this court, as it did before the district court. First, consistent with *Basham v. Finance America Corp.*, 583 F.2d 918 (7th Cir. 1978), *cert. denied, sub nom. DeJaynes v. General Finance Corp. of Ill.*, 439 U.S. 1128, 99 S.Ct. 1046, 59 L.Ed.2d 89 (1979); *Warren v. Credithrift of America, Inc.*, 599 F.2d 829 (7th Cir. 1979), and *Smith*, it should be absolved of any liability because of its subjective good faith compliance with the requirements of Regulation Z. Second, the Supreme Court decision in *Ford Motor Credit Co. v. Milhollin, supra*, requires this court to overrule this aspect of our holding in *Smith*. In light of our reasoning herein, it is not necessary to consider the "good faith conformity defense," but we address ourselves to the impact of *Milhollin*.[8]

*Reexamining Smith in Light of Milhollin*

■ Gates argues that the Federal Reserve Board's letter opinion of December 24, 1975 (No. 982, CCH Cons.Cred.Guide ¶ 31,321), cited earlier, is the controlling interpretation of the inconsistencies between § 1639(a)(1) and Regulation Z § 226.8(d)(1). Similarly, the Federal Reserve Interpretation FC–0114 (12 C.F.R. at 698) does not require the itemization of the component parts of the principal borrowed.

Since this court's decision in *Smith*, the Supreme Court has reasoned that considerable respect is due to an agency's interpretation of the enabling statute and that this principle is especially true under TILA. It stated:

> Congress delegated broad administrative lawmaking power to the Federal Reserve Board when it framed TILA. The Act is best construed by those who gave it substance in promulgating regulations thereunder.

*Milhollin*, 444 U.S. at 566, 100 S.Ct. at 797. The Court further indicated that "Congress has specifically designated the Federal Reserve Board and staff as the primary source for interpretation and application of truth-in-lending law." *Id.* The amendment and expansion of § 1640(f) [good faith conformity] were seen as an unmistakable signal by Congress "to treat administrative rulemaking and interpretation under TILA as authoritative." 444 U.S. at 567–68, 100 S.Ct. at 797–98.

The *Milhollin* case concerned the question whether the nondisclosure of an acceleration clause in the case of default on an auto installment contract violated TILA and Regulation Z. The unanimous decision of

---

8. In *Smith*, this court made clear that *Pollock* would be the guidepost for application of the "good faith conformity" defense provided under 15 U.S.C. § 1640(f). In *Pollock*, the court made clear that even though Regulation Z may not require disclosure of actual proceeds of a loan, § 1639(a)(1) did and creditors would be required to satisfy the statute.

With respect to the availability of the "good faith conformity" defense, the *Smith* court held that "[a]s to loans made before a reasonable period of time had expired after . . . [October 11, 1977], we will not require proof of the subjective good faith of the creditor in following Regulation Z rather than TILA itself." 615 F.2d at 412. We went on to hold "that for loans made after a reasonable period has expired after conclusion of the *Pollock* litigation, courts in this circuit will have to determine whether continued adherence to present forms is excused under section 1640(f)." *Id.* at 413 n.13. We noted that this factual determination of subjective good faith is to be made "in the district court, in the first instance." *Id.*

The loan agreement between Pridegon and Gates was executed on November 19, 1980, well after October 11, 1977, the date the *Pollock* litigation was terminated. Thus, Gates must show subjective good faith compliance with Regulation Z in order to avail itself of the "good faith conformity" defense. Gates argued that the Supreme Court's decision in *Ford Motor Credit Co. v. Milhollin, supra*, which reexamined the weight to be given Federal Reserve Board interpretations of the statute and regulations, required the court to distinguish *Pollock* and *Smith*. It is unclear upon which ground the district court relied in granting Gates' motion because no written decision accompanied the Summary Judgment. We cannot presume from this record that the district court affirmatively made the factual determination of the subjective good faith as required by *Smith*. If this "good faith compliance" were the only defense available to Gates, we would have no other choice but to remand to the district court for the purpose of determining subjective good faith.

the Supreme Court held that the acceleration disclosure was not clearly required by either the Act nor Regulation Z. In light of the clear statutory mandate, a high degree of deference should be extended to consistent staff interpretations of the Act and the Regulation. This position was affirmed in *Anderson Brothers* where the Court held that "... absent some obvious repugnance to the statute, the Board's regulation implementing this legislation should be accepted by the courts, as should the Board's interpretation of its own regulation." 452 U.S. at 219, 101 S.Ct. at 2273.

In light of the deference standard set down by *Milhollin*, we find that the interpretation of § 226.8(d)(1) in F.R.B. No. 982 and FC–0114 is controlling as it is not irrational (*Milhollin*) nor repugnant (*Anderson*) to the statute. As a consequence of this holding, we must overrule this aspect in *Smith* which requires the disclosure of the actual proceeds of a loan ("net cash in fist") and not the general term "loan proceeds." Thus, the disclosure by Gates of the "proceeds" was not a violation of TILA.

### Disclosure Statement

The Disclosure Statement in this case provided that the "Promissory Note is secured by the Security Agreement below ... which *may* cover after-acquired property" obtained by the debtor within ten (10) days of value being given. (emphasis added). The Security Agreement provided that the Promissory Note "*shall* be secured" by after-acquired collateral. (emphasis added). Pridegon argues that this alleged discrepancy renders the entire loan agreement invalid. Secondly, she argues that the security interest was not grouped in logical sequence in that the secured interests were not listed in the box labeled Disclosure Terms.

#### a. "May" versus "Shall"

Pridegon argues that the Disclosure Statement does not accurately "track" the underlying Security Agreement as required

by *Bulger v. Thorp Credit Inc. of Illinois*, 609 F.2d 1255 (7th Cir. 1979) and *Teel v. Thorp Credit Inc. of Illinois*, 609 F.2d 1268 (7th Cir. 1979). In *Bulger*, however, the security agreement listed a general class of items which were not listed in the disclosure statement. Such inconsistencies do not occur in this instance. In *Teel*, the court held that although the inaccuracy in the security agreement was due to clerical error, the defendant was liable for failure to establish procedures to prevent such error. This is not an issue here.

Pridegon argues that Gates violated TILA because of the use of "may" in the Disclosure Statement while the Security Agreement indicates that after-acquired property "shall" be covered. A somewhat similar argument was raised in *Pollock v. General Finance Corp.*, 535 F.2d 295 (5th Cir. 1976), *aff'd on rehearing*, 552 F.2d 1142 (5th Cir.), *cert. denied*, 434 U.S. 891, 98 S.Ct. 265, 54 L.Ed.2d 176 (1977), where the security agreement only provided that it "may" cover after-acquired property. The court held that such a statement did not fulfill the requirements of 12 C.F.R. § 226.8(b)(5).[9] 535 F.2d at 299. On rehearing, the court addressed the weight of the Federal Reserve Board Staff Opinion No. 1053, CCH Cons.Cred.Guide ¶ 31,393 (May 28, 1976), which provides that "a simple disclosure of the fact that after-acquired property may be subject to the security interest would be sufficient to comply with the clear language of § 226.8(b)(5)." The court rejected application of the Staff Opinion for two reasons. First, the Opinion was procured subsequent to the trial in the case. Second, the Opinion conflicted with the requirements under a previous Opinion letter as well as with, in the court's opinion, § 226.-8(b)(5) itself. 552 F.2d at 1144–45.

Reviewing the interpretation provided by F.R.B. 1053, in light of the *Milhollin* standard, we believe it is consistent with Regulation Z and therefore we will not apply the conclusion of the *Pollock* court.[10]

---

9. See n.3, *infra*.

10. It should be pointed out that the Fifth Circuit reversed its holding in the *Pollock* decision on this issue because of the *Milhollin* standard

We find that the use of the word "may" in the Disclosure Statement did not violate § 226.8(b)(5) inasmuch as the Disclosure Statement referred to the Security Agreement which expressly provided that the Promissory Note was in fact secured by after-acquired property.

### b. Fuller Disclosure

Pridegon further argues that the security for the Promissory Note should have been completely disclosed within the Disclosure Statement itself rather than the mere reference to the "Security Agreement below." The Security Agreement provided clearly that the Promissory Note was secured by the Buick Regal and after-acquired consumer goods acquired by Pridegon within ten days after Gates gave value. As this court held in *Bulger*:

> [d]isclosure by incorporating references is permitted only under limited circumstances. *Regulation Z requires that complete disclosure be accomplished on one side of one document* without use of references to separate documents unless a full identification of the property "cannot properly be made on the disclosure statement due to the length of such identification." 12 C.F.R. § 226.8(b)(5).

609 F.2d at 1258. (emphasis added). In this Loan Agreement, the Disclosure Statement referred to the Security Agreement which was on the same side of the document. Federal Reserve Official Staff Interpretation FC–0023, Appendix to 12 C.F.R. at 629, while limited to the facts presented, indicates that when reference is made to a specifically identified agreement, "such a disclosure would adequately describe the type of security interest involved."

We find this disclosure totally adequate. As the Supreme Court stated in *Milhollin*, "[m]eaningful disclosure does not mean *more* disclosure." 444 U.S. at 568, 100 S.Ct. at 798 (emphasis in original). In this case,

requiring a more detailed listing in the Disclosure Statement would not have increased the meaningfulness or quality of the disclosure. Repetition of the security interest would have been an "informational overload." *Id.*

### Conclusion

For all the reasons discussed above, we Affirm the decision of the district court.

toward Staff Opinions in August, 1981. In *Smathers v. Fulton Federal Savings and Loan Ass'n*, 653 F.2d 977, 981 (5th Cir. 1981), that court held "this new statement by the Court as to the weight with which we must view inter-

pretative acts by the staff of the Federal Reserve Board requires us to conclude that as to the argument between the use of 'may vs. will' the *Pollock* case can no longer be considered a binding precedent."